# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>**Plaintiff**<br><br>v.<br><br>**FREDDIE RIVERA-MARRERO**<br>**Defendant** | **Criminal No. 05-116(DRD)** |

## MAGISTRATE-JUDGE'S REPORT AND RECOMMENDATION

Defendant Freddy Rivera-Marrero (hereafter "Rivera") filed a motion for return of seized property pursuant to Fed.R.Crim.P. 41(g) and motions to suppress (**Docket Nos. 15, 20, 23**). Rivera moves to suppress evidence seized subsequent to his arrest. He also moves to suppress statements made by him at the time of his arrest. The government responded and a suppression hearing was held on August 2, 2005 (**Docket Nos. 19, 26, 31**). Briefs were also submitted by the parties following the suppression hearing (**Docket Nos. 34, 36**).

During the suppression hearing, on behalf of the government, testimony was elicited from law enforcement officers, namely: Miguel Martínez, Luis A. Colón, Roberto Vizcarrondo, and Manny Varela. On behalf of the defendant, testimony was elicited from Carmen Salas-Rodríguez and Lucía Mariel Rodríguez-Pilarte. Additionally, exhibits admitted include: the September 20, 1994 arrest warrant; photographs taken at defendant's residence; Vizcarrondo's affidavit; Waiver of Rights Form in English and Spanish; consent to search in English and Spanish; a statement made by Rivera; and a Report of Investigation prepared by law

enforcement agents. (**Docket No. 30**, Government's Exhibits Nos. 1-10, Defendant's Exhibit E).

Upon consideration of the pleadings filed and the testimony and evidence presented at the evidentiary hearing, this Magistrate-Judge **RECOMMENDS** that the defendant's Motions be **DENIED**.

## I.      Findings of Fact

The following law enforcement officers were called to testify on behalf of the government: **Agent Miguel Martínez** (hereafter "Agent Martínez") who works for the Puerto Rico Police and is assigned to U.S. Marshal's Office Fugitive Task Force. His duties include looking for fugitives at the state or federal level, mainly those that are considered dangerous; meaning armed fugitives or fugitives dealing with drugs; **Agent Luis A. Colón-Vega** (hereafter "Agent Colón") who is employed with the Puerto Rico Police, and is the leader of the SRT Group in San Juan. The SRT Team provides support to federal and state law enforcement agencies; **Deputy U.S. Marshal Roberto Vizcarrondo** (hereafter "Deputy Vizcarrondo"), Supervisor, Fugitive Task Force, and **Deputy U.S. Marshal Manny Varela** (hereafter "Deputy Varela"), a member of the U.S. Marshal's Fugitive Task Force.

Agent Martínez was involved in an investigation of the defendant. Prior to February, 2005 he knew that defendant Rivera was a fugitive based upon information received from an informant. The information was independently corroborated fully by February, 2005. Agent Martínez's investigation revealed that Rivera had been imprisoned due to a drug conviction and had later, in 1994, escaped

from Hogar Crea, a residential program. Rivera was declared a fugitive in September, 1994 and, an arrest warrant was issued. Agent Martínez had information revealing that Rivera continued to be involved in drug dealings and that he was always armed. During the investigation surveillance was carried out. During the same Rivera was seen on different occasions driving one of four vehicles: a Mercedes Benz, a Ram pickup truck, a grey pickup truck and/or a Grand Marquis.

On April 6, 2005, a nationwide federal operation was carried out which resulted in execution of numerous outstanding arrest warrants for fugitives. Rivera's case was one assigned to the U.S. Marshal's Service Puerto Rico Fugitive Task Force. Agent Martínez, Agent Colón, Deputy Vizcarrondo, and Deputy Varela worked together on the operation. Agent Colón was the leader of the SRT Team during the arrest of Rivera, and Agent Vizcarrondo was the team leader. Law enforcement agents had previously secured two arresting teams, each one was to simultaneously visit each of the residences in which defendant Rivera had been frequently seen.

On April 6, 2005, Rivera was at the Golden Gate Urbanization, F Street, Q9, Caguas, early that morning, around 6:00 AM. The police knocked on the door, announced their presence and Rivera opened the door after approximately five minutes. Once Rivera opened the door, law enforcement officers entered the residence and by conducting a security sweep they made sure that there were no armed persons, either inside or outside the residence. Upon entering the residence, Rivera was moved to the side and placed on his knees. When asked to identify himself, he gave the name of José Veléz-Sánchez, an individual who, according to

an informant, had been murdered years before.  When asked a second time, the defendant stated that his name was Freddie Rivera.  At this point defendant Rivera was handcuffed and advised of his Miranda rights. At the time of Rivera's arrest, Agent Colón checked to make sure defendant Rivera was not carrying a weapon. Rivera was not armed and was clothed only in his shorts.  Two other persons were located in the premises, Luz Rodríguez-Pilarte (hereafter "Rodríguez"), who was identified as defendant's common-law wife, and her minor daughter, C.S.R. (hereafter "C.S.R.").  Rodríguez has lived a conjugal lifestyle with Rivera for the past ten years.

Agent Martínez further indicated that he served Rivera with copy of the arrest warrant and Rivera was taken to the dining room table while Agent Martínez awaited for a signal indicating that the premises were safe.  It was at this time that Agent Martínez first saw Rodríguez.  She was in the dining room area and Agent Martínez recalled she was dressed and wearing a blouse and pants.  Agent Martínez indicated that approximately five minutes passed from the time he intervened with Rivera until he first saw Rodríguez.  Agent Colón also testified having seen saw Rodríguez and C.S.R. as both walked into the room.  They were both dressed, and were told to sit in a chair.  When Deputy Vizcarrondo was called to testify, he narrated that when he first saw Rodríguez she was wearing a red shirt.  However, he could not recall what C.S.R.  was wearing.  Deputy Varela, who was inspecting the garage area, testified that he also saw Rodríguez and the minor right away when he entered the living room, and they were already sitting on the sofa.

A security sweep was conducted because the agents had been placed on notice that Rivera usually carried weapons and was involved in narcotics trafficking. Agent Colón testified that the house was searched to make sure no one else was there. The sweep reflected no other people were in the house. Deputy Varela testified he also helped to conduct the security sweep. He testified that the sweep took approximately 25 minutes, and that no evidence was seized during the security sweep.

Deputy Vizcarrondo's recollection is that Rivera was arrested around 6:45 AM. It is noted that he Report of Investigation prepared on April 6, 2005, at 4:41 PM, contains the same information (Government's Exhibit 10). Once Rivera was arrested and while still on site, Deputy Vizcarrondo and Deputy Varela took custody of the operation. Reportedly, Rivera's rights were read to him once again by Agent Vizcarrondo. Deputy Vizcarrondo informed Rivera that there was a warrant for his arrest and that he had been declared a fugitive. Reportedly, after his rights were read Rivera proceeded to waive his rights and give a statement.

While sitting at the dining room table, Rivera signed a waiver of his rights (Government's Exhibit No. 6, 6A). It was logged at 7:15 AM. Agent Vizcarrondo testified that the waiver of rights was obtained after the security sweep, but before the search of the residence and the search of the vehicles. Deputy Varela through his testimony corroborated that of Deputy Vizcarrondo

Agent Martínez stated he was present when Rivera signed the Waiver of Rights Form and he testified that it was signed in the morning hours. Also present were

Deputy Vizcarrondo, a policewoman from the CIC Bayamón and Deputy Varela. On the back of the Waiver of Rights Form Rivera referred and accepted the illegal possession of narcotics and a loaded weapon. A statement was given by Rivera right after he signed his Waiver of Rights From. Deputy Vizcarrondo testified that Rivera made a statement in which he admitted that he was in possession of a 9mm pistol, and informed that it was in the Ford Explorer. Deputy Vizcarrondo testified he witnessed while Rivera wrote the statement on the back of the Waiver of Rights Form (Government's Exhibit No. 6).

Neither Agent Martínez nor Deputy Varela heard Rivera ask for an attorney. Conversely, Rodríguez testified that she heard as he requested legal assistance.

The evidence available also shows that Rivera signed a consent to search (Government's Exhibit No. 7). The consent to search Form does not reflect the time in which the document was signed, inasmuch as it does not contain a time block. Agent Vizcarrondo told Rivera that in order to search any vehicles on the property they needed Rivera to authorize it by signing the appropriate form. Accordingly, Rivera was provided with a consent to search and it was signed (Government's Exhibit No. 7, 7A). Deputy Varela testified that he was present and witnessed as Rivera signed the consent to search. The consent allowed for the search of the premises and listed the properties or vehicles that Rivera authorized to be searched.

After Rivera signed the waiver of rights and consent to search he claimed to be the owner of the property located in Golden Gate, although it was placed under a false name or owner. He also admitted that he had a narcotics distribution point

in Cataño, and that he netted $40,000 per month at the drug point.  Rivera also alleged that all the vehicles belonged to him, although they were placed in other's names to avoid detection, that he owned other property in the municipality of Toa Alta and that he had a small boat or jet ski on such property.

Rodríguez also signed a consent to search (Government's Exhibit No. 8).  Agent Vizcarrondo testified that Rodríguez voluntarily signed the Consent Forms, and that no one was pointing weapons or ever threatened Rivera or Rodríguez in order for them to sign the forms.  Deputy Varela also testified that Rivera voluntarily signed the consent to search form.  Agent Martínez testified that he overheard Rivera while saying there was nothing at the house and that because of it, he authorized to have the house searched.

Contradicting the agents' statements, Rodríguez testified that the consents to search were not signed until late in the afternoon,  at a time when the agents were about to leave.  She recalled it was approximately 5:00 PM.  This testimony conflicts with the Draft of a   Report of Investigation which was  prepared at 4:41 PM on that same day.   Were Rodríguez's statements to be credited, this will compel the conclusion that the report was prepared 20 minutes prior to the time in which Rodríguez asserts having consented to the search (Government's Exhibit 10).   The report of investigation reflects that the consents to search were signed on or about 7:15 AM.

During her testimony, Rodríguez testified that she felt threatened to sign the document and consented to the search, inasmuch as all the agents had weapons.

Nonetheless, she never asserted that those weapons were ever drawn or pointed at her. Rodríguez testified that she signed the consent to search because she was told she had to do so (Government's Exhibit No. 8). She was afraid that if she did not sign the consent they would press charges against her. Rodríguez, that the police told Rivera that if he did not tell the truth, conspiracy charges would be filed against her, and a social worker would be called to take custody of the minor. Though the record reflects differently, Rodríguez testified that Rivera did not sign a consent to search the vehicles. Rodríguez further testified at a later stage in her testimony that at the time in which Rivera signed the consent to search, he was sad and very scared because he had been told by the law enforcement officers that they would deport her. Rodriguez in cross-examination testified, however, that she is a legal resident of the United States.

Once Rodríguez and Rivera had consented to the search of the house and vehicles, Deputy Varela and Agent Martínez conducted the search. Deputy Vizcarrondo testified that no searches occurred prior to consents to search being signed. Deputy Varela recalled seizing from the residence some cash and believed that other items seized were: some golden watches, bracelets, golden chains and cellular phones. Also, crack cocaine, drug paraphernalia, ammunition, and a 9mm weapon were sized from the green Ford Explorer. Deputy Varela testified that he searched the Ford Explorer after the consent to search was signed.

C.S.R., a minor, is Rodríguez's daughter. She testified that she was asleep in a locked room when the officers arrived, and that they forced her bedroom door

open.  She further testified that before Rivera (referred to by her as her father, although he is not her biological father) signed any papers, the Marshals were checking the vehicles and that they had obtained access to the vehicles by using car keys that were in the house.  The parties stipulated that the keys were in an open space or visible area, available to anyone looking in the house.  Actually, Rodríguez testified they used to keep the keys within a basket located over a counter top in the kitchen (Exhibit E, page 35).  She also testified that, while Rivera was sitting at the table with the officers, guns were present.

Rodríguez testified that when the police arrived at 6:00 AM she had just taken a shower and was drying herself and was naked.  She testified that the law enforcement officers insisted that she exit the room, so she covered herself with a comforter because the police did not allow her time to get dressed.  Rodríguez indicated that when she left the bedroom, the officers were already searching the vehicles.  She further testified that she remained naked from early morning hours until around 3:00 PM, when she was finally allowed to get dressed.  She testified that this was about an hour after the time she made the request to get dressed.  This testimony is contrary to the testimony of Agent Martínez, Agent Colón, Deputy Vizcarrondo and Deputy Varela, all of whom testified that when they first saw Rodríguez she was dressed.  Some of these witnesses were even able to describe how Rodríguez was dressed.  Additionally, Agent Colón's testimony does not corroborate that of C.S.R. or Rodríguez.  He testified that agents did not go into the C.S.R.'s room

and get her out of bed, nor did they break into the shower and take Rodríguez naked from it.

The evidence on record also shows that when Rivera was first apprehended he gave the name José Vélez-Sánchez. At the hearing, when specifically asked whether she knew José Vélez-Sánchez, Rodríguez testified that she did not know a "José Vélez-Sánchez." Later on she admitted knowing that Rivera had used the name to disguise his real identity because he had many enemies. Testimony elicited from Rodríguez revealed that the house being searched in Caguas is owned by Rodríguez and her spouse, and that he bought the same while identifying himself with the false name of "José Vélez-Sánchez." This means that, although she testified that she did not know such a "José Vélez-Sánchez," she had actually bought the house and signed deeds with Rivera while using a fictitious name.

When specifically asked in direct examination, Rodríguez provided the following testimony regarding the ownership of the vehicles at issue: the red pickup truck (Dodge Ram) belongs to an individual named Miguel;[1] the Montero (Mitsubishi) belongs to Jesús, a friend of Rivera;[2] and the gray pickup truck (Dodge Ram) belongs to a person named Alex, who gave it to Rivera who was asked to sell it.[3] Rodríguez asserted she had purchased the Grand Marquis to take her daughter to school.

---

[1]   Reportedly the red Dodge Ram truck (with clearly identifiable bullet holes in it) had been lent to Rivera (Exhibit 15).

[2]   Government's Exhibit E , pages 9-13, depicts a Montero.

[3]   See Government's Exhibit E, page 17.

Rodríguez also testified that Rivera has no title or possessory interest in the Ford Explorer, the Mitsubishi, the Mercury Grand Marquis, the gray Dodge Ram truck or the red Dodge Ram truck.

During her testimony Rodríguez asserted that she did not authorize the search of any vehicle registered to her. She testified that the green Ford Explorer is registered to her, but that it was being used by a young man named Edilberto Rodríguez, who works in their business. This young man had been terminated from his employment about 15 days prior to the search. Rodríguez testified that she had no idea that there were drugs and a firearm inside the vehicle.

## II.    Conclusions of Law

Rivera moves the Court for an Order directing the government to return seized property including approximately $2,160, three mobile telephones, one Rolex wrist watch and a 2001 Sea Doo Jet Boat.  Alternatively, Rivera requested a hearing requiring the government to meet its burden to prove probable cause for the seizure and a legitimate basis for retaining custody and control over the seized funds and property (**Docket No. 15**). In response to this motion, the government states that the jet boat was administratively seized by the U.S. Marshal Service and it can find no evidence that a Rolex watch was ever seized from defendant's residence. As to the money and cell phones, the government contends they were properly and lawfully seized. It is further asserted that Rivera lacks standing to contest the seizure.

In Rivera's Motion to Suppress (**Docket No. 20**) defendant moves to suppress evidence seized from his residence pursuant to a warrantless search by the U.S.

Marshal Service. He also moves to suppress the written statements allegedly made by him during interrogation by Deputy U.S. Marshals during the search of his residence. At the suppression hearing, Rivera orally moved to include within his petition to suppress the firearms and drugs seized (**Docket No. 31**, pp. 15-16). Rivera argues that a protective sweep was conducted without his consent, that no exigent circumstances justified the search, that his consent to search was involuntary because it was coerced, and he was not given Miranda warnings before questioning and giving incriminating statements.

The government in opposing defendant's request asserts that defendant's request should be denied because: (a) the entry into Rivera's residence was pursuant to a lawful arrest warrant; (b) a protective sweep was conducted for the safety of law enforcement personnel and no evidence was seized during same; (c) Rivera was read his Miranda warnings and voluntarily waived his rights; (d) Rivera and Rodríguez voluntarily provided their written consents to search; and (e) Rivera lacks legal standing to challenge the evidence seized from the vehicles.

Before going any further, it must be noted that for the most part, the undersigned finds the testimony of Rodríguez less than credible. Much of her testimony quite simply was not believable. One glaring example was her assertion that she did not know José Vélez Sánchez, although her long time partner goes by that name. More so, Rodríguez owns property along with the individual who has been improperly (if not illegally) using the name of José Vélez Sánchez. The undersigned is also skeptical of Rodriguez recollection and version of the time-line

of events, and assertions that she was required to remain naked all day, despite her repeated requests to be allowed to get dressed.

### A. Protective Sweep

Rivera contends that law enforcement officials entered his residence and conducted a protective sweep without consent. He contends that agents had no justification to conduct the sweep of the premises.

The Supreme Court has defined a "protective sweep" as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *United States v. Jiménez*, 419 F.3d 34, 41 (1st Cir. 2005) (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)). A protective sweep lies within the confines of the Fourth Amendment.[4] Accordingly, "the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Jiménez*, 419 F.3d at 41 (quoting *United States v. Knights*, 534 U.S. 112, 118-19 (2001); *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). Therefore, "the searching officer [must] possess[] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ ] the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Id.* (quoting *Buie*, 494 U.S. at 327).

---

[4]The Fourth Amendment of the United States Constitution provides that the "right of people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated . . ." It further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Stanford v. Texas*, 379 U.S. 476, 485 (1965).

In the case at bar it remains undisputed that Rivera was a known fugitive and prior surveillance, confidences and investigation revealed that he was involved in drug trafficking, that he was always armed, and kept a firearm at his residence. Additionally, it was known by law enforcement officers that other persons were present in the house at the time of Rivera's arrest. These facts provided justification for the agents to conduct a protective sweep, inasmuch as a reasonably prudent officer could believe that the area harbored an individual who posed a danger to the officer. More so, the sweep was of short duration, no more than 25 minutes, and the testimony of the law enforcement officers is that no evidence was taken during the protective sweep.

### B.     Miranda Warnings

Rivera argues that he was not given Miranda warnings before questioning and allegedly giving incriminating statements. He further contends that he was in custody at the time the statements were allegedly made and, therefore, Miranda warnings were required.

It is well established that "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona,* 384 U.S. 436, 444, (1966). In order for a defendant to make out a claim under *Miranda,* "his statements must have been the product of custodial interrogation." *United States v. López,* 380 F.3d 538, 545 (1st

Cir.2004). The "custody" element is satisfied if the defendant is under arrest. *United States v. Ventura,* 85 F.3d 708, 710 (1st Cir.1996).

It is undisputed that Rivera was in custody, inasmuch as he was placed under arrest immediately once law enforcement agents entered his residence. Undisputed testimony elicited during the suppression hearing indicates that Rivera was administered Miranda warnings, not once, but twice. Not even in Rivera's affidavit, does he state that he did not receive Miranda warnings (**Docket No. 20**). Based upon the uncontradicted statements of law enforcement agents, Rivera was warned of his rights upon his initial apprehension, and the second time he was warned by Deputy U.S. Marshal Vizcarrondo. More so, Government's Exhibit 6 reflects that by 7:15 AM, Rivera had signed a written waiver of these rights, and the waiving and signing of the Waiver Form was witnessed by two other Deputies from the U.S. Marshal Service.

A waiver of Miranda rights must be both voluntary, and knowing and intelligent. *Moran v. Burbine,* 475 U.S. 412, 421 (1986). A waiver is voluntary when "it [is] the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* A waiver is knowing and intelligent when "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Both inquiries are judged based on the "totality of the circumstances surrounding the interrogation." *Id.*

Rivera is no stranger to the criminal justice system. According to Deputy Vizcarrondo, Rivera understood his rights at the time he signed the waiver and was

willing to answer the questions that were posed to him by law enforcement authorities (Government's Exhibit 5). There is nothing in the record to refute this. The government has submitted into evidence photographs of defendant while under her custody and still at his residence. While he is observed handcuffed, he is not observed or perceived as if under distress. He is pictured while signing the Waiver of Rights Form. (Government's Exhibit No.3). The picture depicts a law enforcement agent nearby, thus, there were witnesses of the circumstances and time in which the Waiver was signed. More so, some of the pictures taken from the items seized and the vehicles searched do reflect a time (i.e., 11:26 a.m.; 12:26 p.m.). (Government's Exhibit No. E). This time being subsequent to the waiver of rights.

Based upon the foregoing reasons, the Court finds that Defendant's waiver of his Miranda rights was made with full knowledge of what those rights were and what the waiver entailed. As such, it is **RECOMMENDED** that the Motion to Suppress statements be **DENIED**.

### C.      Consent/Waiver

Rivera argues that his consent to search and that of Rodríguez are invalid because it was not voluntary, but rather coerced. In support, Rivera contends that his residence had been entered without his consent, he was surrounded by government agents with their guns drawn, and that both he and Rodríguez were told that Rodríguez would go to jail or be deported if they did not consent to the search.

The government responds that there were consents authorizing the searches of the residence and vehicles. The record contains two written Consents to Search Forms, both dated April 6, 2005. The consent to search signed by Rivera specifically

provides a consent to search the premises of his residence in Caguas, and the following vehicles: Ford Explorer, Mitsubishi Montero, Mercury Grand Marquis, and two Dodge Ram trucks.

"[O]ne of the specifically established exceptions to the [Fourth Amendment] requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *United States v. Meléndez,* 301 F.3d 27, 32 (1st Cir. 2002) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)). "[A] search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Groh v. Ramírez,* 540 U.S. 551, 560 (2004) (quoting *Cámara v. Municipal Court,* 387 U.S. 523, 528-29 (1967)). A warrantless search is not unreasonable "where voluntary consent has been obtained, either from the individual whose property is searched, . . ., or from a third party that possesses common authority over the premises." *United States v. Torres,* 188 F.Supp.2d 155, 157-58 (D.P.R.2002) (citations omitted); *see also Illinois v. Rodríguez,* 497 U.S. 177, 181 (1990); *United States v. Marshall,* 348 F.3d 281, 284 (1st Cir. 2003).

When using a consent form to obtain consent to search, the form must be signed before the search is conducted; otherwise the consent is invalid. *See United States v. Tibbs,* 49 F.Supp.2d 47, 53 (D.Mass.1999). Additionally, in order for consent to be valid it must be given voluntarily. *United States v. Weidul,* 325 F.3d 50, 53 (1st Cir.2003). In examining the voluntariness of the consent, the courts look at the totality of the circumstances. *United States v. Luciano,* 329 F.3d 1, 7 (1st Cir.2003); *United States v. Coraine,* 198 F.3d 306, 309 (1st Cir.1999); *United States v. Barnett,* 989 F.2d 546, 554-55 (1st Cir.1993).

Rivera contends that his consent to the search was not voluntary, but was coerced. "Proof of valid consent requires that the prosecution show, by a preponderance of the evidence, that the consent was knowingly, intelligently, and

voluntarily given." *United States v. Marshall,* 348 F.3d 281, 285-86 (1st Cir.2003). Factors to be considered in determining whether consent was voluntarily given include "age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics." *Id.* at 286.

As previously discussed, Rivera is familiar with the criminal justice system. Also, at the time of the arrest he was 40 years of age. Agent Vizcarrondo testified that Rivera voluntarily signed the consent to search form, and that no one was pointing weapons at him. Deputy Varela also testified that Rivera voluntarily signed the consent to search. Finally, Agent Martínez testified that he heard Rivera say there was nothing at the house and that because of it he signed the consent to search the house. Inasmuch as Rivera has cohabited with Rodríguez for the past ten years and should be aware of her legal status or citizenship, the undersigned is hard pressed to find credible that Rivera was coerced into signing a consent to search upon any threats to deport Rodríguez.

Based upon the totality of the circumstances, the Court finds that defendant's consent to search was voluntary, and as such the Motion to Suppress any evidence seized during the consensual search should be **DENIED**.

**D.    Legal Standing**

The government argues that Rivera lacks standing to suppress the evidence obtained from the vehicles searched.

"Before embarking upon the merits of a suppression challenge, a criminal defendant must show that he had a reasonable expectation of privacy in . . . relation to the items seized." *United States v. Aguirre,* 839 F.2d 854, 856 (1st Cir. 1988). "Such an expectation of privacy is a threshold standing requirement that a defendant must establish before the court can proceed with any Fourth Amendment analysis."

*United States v. Lewis,* 40 F.3d 1325, 1333 (1st Cir.1994) (citing *United States v. Cruz-Jiménez,* 894 F.2d 1, 5 (1st Cir.1990)). Nonetheless, the reformulation of standing does not change the traditional test.  The courts still recognize that the person must possess (1) a subjective expectation of privacy in the area searched, *United Sates v. Bouffard,* 917 F.2d 673, 677 (1st Cir. 1990) (citing *United States v. Cruz-Jiménez,* 894 F.2d at 5); (2) which society is prepared to recognize as reasonable. *United States v. Bouffard,* 917 F.2d at 677 (citing *California v. Greenwood,* 486 U.S. 35, 39 (1988)). In making the determination of whether a defendant has made this showing, a court looks "to whether or not the individual thought of. . .the article. . .as a private one, and treated it as such." *Id.* at 857.  First Circuit precedent reflects that, in general, "standing" does not exist to challenge a search of a vehicle when the defendant neither owns nor is in possession of the vehicle in question. *United States v. Maguire,* 918 F.2d 254, 261 (1st Cir.1990) (citing cases).

The testimony of Rodríguez is that the Ford Explorer was registered in her name, and that it was used by a young man named Edilberto Rodríguez who worked for their business, although he had been terminated from employment 15 days prior to the search.  She also testified that she did not believe that Rivera had any title, interest or possessory interest in the vehicle.  Rodríguez also testified that the red Dodge Ram truck belonged to an individual named Miguel who had lent it to Rivera and that the gray Dodge Ram truck belonged to an individual named Alex who had given the vehicle to Rivera to sell.

Accordingly, based upon the testimony of Rodríguez, Rivera had no legal interest nor was the owner of these vehicles. Thus, his privacy interest are questionable. More so, the facts and circumstances are not sufficient to establish Rivera's standing. Even assuming that Rivera occasionally drove any of these vehicles, the evidence reflects that Rivera was neither the owner nor the individual in exclusive possession of the vehicles. The weapons and drugs were found in a vehicle registered to Rodríguez which could have been used by either one of them or a third person authorized by them. Accordingly, as to the vehicles Rivera has not crossed the "standing" threshold, and therefore the "*bona fides* of the search and seizure are not put legitimately into issue." *Id*. at 856. Given the defendant's lack of standing to pursue the instant motion, as to any search and seizures of the Ford Explorer and two Dodge Ram trucks, the motion must be **DENIED**.

### E.   Jet Boat

As to the seizure if the Jet Boat on April 7, 2005, the government advises the Court that same was administratively seized by the U.S. Marshal Service. Accordingly, Rivera's remedy is to comply with the civil administrative forfeiture procedures to reclaim said property.

## III.   Conclusion

It is therefore **RECOMMENDED** that the motion filed by defendant Freddy Rivera-Marrero for an Order Directing the United States to Return Seized Property Under Fed.R.Crim.P. 41(g) (**Docket No. 15**), defendant Freddy Rivera-Marrero's Motion to Suppress (**Docket No. 20**) and Supplemental Motion (**Docket No. 23**) be **DENIED**.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule and Rule 72(a) of the Local Rules of Court.  Any objections to the same must be specific and must be filed with the Clerk of Court **within ten (10) days** of notice.  Rule 72(d), Local Rules of Court; Fed. R. Civ. P. 72(b).  Failure to timely file specific objections to the Report and Recommendation waives the right to review by the District Court, and waives the right to appeal the District Court's order.  *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980).  The parties are advised that review of a Magistrate-Judge's Report and Recommendation by a District Judge does not necessarily confer entitlement as of right to a *de novo* hearing and does not permit consideration of issues not raised before the Magistrate-Judge. *Paterson-Leitch v. Massachusetts Elec.*, 840 F.2d 985 (1st Cir. 1988).

**SO RECOMMENDED.**

At San Juan, Puerto Rico, this 2nd day of November, 2005.


**S/ *AIDA M. DELGADO-COLON***
**AIDA M. DELGADO-COLON**
**U.S. Magistrate-Judge**